IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KURSTIN B. & AUSTIN B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KURSTIN B. AND AUSTIN B., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JANA B., APPELLANT.

Filed November 27, 2018.    Nos. A-18-357, A-18-358.

Appeals from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Darin J. Knepper, Deputy Scotts Bluff County Public Defender, for appellant.

No appearance for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

### INTRODUCTION

Jana B. appeals from the decision of the county court for Scotts Bluff County, sitting as a juvenile court, adjudicating her minor children, Kurstin B. and Austin B., under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), and terminating her parental rights to her children. After our de novo review of the record, we affirm.

### BACKGROUND

Jana is the mother of Kurstin, born in May 2001, and Austin, born in August 2003. The children were removed from their home, where they lived with Jana and their father, Brian B., on

December 15, 2017, following an incident that occurred on December 12. On December 12, Officer Andrew Soucie of the Scottsbluff Police Department responded to a call for help from Jana's home. Kurstin and Austin were present at the home when Soucie arrived. The children saw Jana take an unknown number of antidepressant pills and observed her acting erratically. When Soucie made contact with Jana she was irate and incomprehensible. Jana made several references to a friend who had committed suicide and "she understood why she did it." Additionally, Austin indicated that Jana became physically violent with him, striking him in the face and slamming a door on him. Jana was taken into emergency protective custody and was transported to a local hospital.

Following their removal, the children were placed with their older sister in Geneva. The State subsequently filed a petition seeking to adjudicate the children under § 43-247(3)(a), and to terminate Jana and Brian's parental rights to the children. The petition alleged that Jana neglected or refused to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of the children, and that the children lacked proper parental care by reason of the faults or habits of Jana. It further alleged that Brian failed to protect the children. The State sought termination of Jana's parental rights under Neb. Rev. Stat. § 43-292(2) and (5) (Reissue 2016) and of Brian's parental rights under § 43-292(2). A guardian ad litem was appointed for the children and for Jana. A joint adjudication and termination hearing was held approximately 3 months after that pleading was filed. Although the State sought termination of Brian's parental rights, the juvenile court found that it was not in the children's best interests to do so; therefore, Brian's interests are not at issue in this appeal and he will be discussed only as necessary to address Jana's arguments.

At the joint hearing, the State presented evidence from numerous law enforcement officers who had contact with Jana in the 2 years preceding the hearing. Officer Chris Calvert testified that in June 2016, he was called to Jana's residence in reference to Jana "being out of control and throwing things." The call was made by one of the children's friends. Calvert was familiar with Jana from having "dealt with her many times on previous calls." When Calvert arrived, he was advised by Brian that Jana had sprayed him in the face with Scotchgard and threatened to shoot him and gouge out his eyes. This incident occurred in front of Austin and another minor. When Calvert arrived, Jana was "very animated and agitated" and was unable to have a focused conversation. As a result of Jana's threats, she was taken into emergency protective custody.

Corporal Mathew Broderick testified that in September 2016, Jana was in a van with Kurstin and three other minors at 2 a.m. After being pulled over, Jana indicated to Broderick that she was teaching one of the minors how to drive. Broderick smelled alcohol coming from the van and two of the minors tested positive for alcohol. Broderick testified that he has had numerous police contacts with Jana concerning her mental health status and substance abuse issues.

Two additional law enforcement officers testified about contacts they had with Jana in 2016 due to her driving erratically or under the influence. On one such occasion, Jana had followed an ambulance and when it pulled into a parking lot, she stopped behind it. Based on the emergency medical technicians' contact with her, they contacted police. When the law enforcement officer arrive, Jana was "mumbling and was weepy and wasn't stating things that were making a lot of sense." When asked about her mental health, she responded that "she exists" and claimed that she

"had nothing left to lose." Based upon his contact with Jana, the officer took her into emergency protective custody and she was admitted to the behavioral health unit at a local hospital.

Another law enforcement officer testified to a December 2016 incident in which Jana was driving a car with multiple minors, and one minor, age 15, had to take over driving the vehicle due to her fear that Jana was under the influence of drugs. After the minor took over, she went off the road and jumped over the railroad tracks. The minors then left Jana with the vehicle and the police arrived.

Finally, Officer Dominick Peterson testified that on April 15, 2017, he responded to a call from Jana's residence after a visitor to the home became concerned about her safety. Peterson found Jana sobbing on her front porch. Peterson could not communicate with Jana due to her erratic behavior and testified that Jana stated "there was not much life to live anymore." Following this, Peterson took Jana into emergency protective custody and transported her to the hospital. While en route, Jana asked Peterson to "use [his] gun" and stated "life isn't worth living."

In addition to testimony from law enforcement officers, the State presented testimony from witnesses who offered help and support to Jana, Brian, and the children. A social worker who worked at Citrus House, a program for adults with severe and persistent mental illness, testified that she has been involved with Jana over the last 2 years and that Jana refused to cooperate with Citrus House, or any treatment facility that Brian attempted to arrange for her, nor would Jana take her prescribed medications.

Cheryl Phinney, a psychiatric nurse practitioner, provided treatment for Jana on numerous occasions when she was admitted to the hospital under emergency protective custody. Phinney testified that Jana had admissions in June and September 2016 and in April and December 2017. On several occasions, she was discharged from the behavioral health unit at the hospital to the Lincoln Regional Center. According to Phinney, Jana has a long history of schizoaffective disorder, bipolar type. As a result of this condition, Jana has delusions, she experiences psychosis, and she has mood swings between mania, where she does not sleep for days at a time, and intense depression. Phinney opined that, while Jana's condition is treatable with medication, Jana does not believe she needs medications and does not cooperate with any treatment. Phinney further testified that Jana receives medication when she is admitted to the hospital, but she only takes the medication because she knows that she must do so to be released, and does not continue her treatment once she is discharged. It also appeared to Phinney that without medication, Jana's condition is worsening and her delusions have become more fixed and long-lasting. According to Phinney, Jana may be becoming medication resistant, which occurs when a patient fails to take medication consistently, but rather, takes medication once and then moves on. As a result, Jana fails to recover as well from each subsequent episode.

A child and family service specialist for the Nebraska Department of Health and Human Services (DHHS) testified as to the services offered to the family. She relayed that she discussed medication management and a possible mental health facility for Jana but Jana was not receptive to those recommendations. She has attempted many conversations with Jana, but Jana is obsessed with off-topic conversation including past murders, terroristic law enforcement, and feelings of alienation and discrimination. According to the DHHS worker, Brian reports that Kurstin and Austin do not want to be around Jana and find her "annoying." Although Brian was having

- 3 -

visitation with the children, Jana has not participated stating "someone has to stay home with the dog."

The DHHS specialist opined that "due to [Jana] not addressing her mental health appropriately and not even admitting that she even has mental health needs places the children under stress." As a result, she concluded that "if the children were to be returned to their parents' care that they would be placed back at risk into an unstable, unsafe environment with potential for continued harm of the children's safety and well-being." It was her recommendation that Jana's parental rights be terminated.

The evidence further showed that Jana had no role in the house, with Brian assuming all parenting responsibilities. Likewise, Jana has not held a job outside of the home during the pendency of the case. It was also established that Jana would stay up all night, often screaming about past events, primarily past murders and police conspiracies, which would keep Kurstin and Austin awake, and prevented Jana from having a beneficial relationship with the children.

Both Kurstin and Austin were on probation for truancy in the months leading up to their removal from the home. Their probation officers testified that Jana's erratic behavior played a significant role in the children's behavior. The probation officers also testified that the children's behavior improved while Jana was out of the house, or while the children were in foster care. However, when Jana returned to the home, the children would become upset again.

Jana did not have any visitations with Kurstin and Austin after they were removed from the home, nor did she attend the termination hearing. Jana continued to refuse to acknowledge her mental health concerns, and has not received adequate treatment for her mental illness.

The State also presented evidence that the children were previously adjudicated under § 43-247(3)(a) in April 2017, due to Jana's unaddressed mental health issues and were placed in foster care for 1 month. During this time, Jana was committed to a mental health facility by order of the mental health board and was out of the house. Prior to her commitment, Jana routinely made suicidal comments in front of the children, including asking Kurstin for the car keys so that "she could park on the railroad tracks." Additionally she would frequently threaten to sign away her parental rights, often in front of the children.

Following the hearing, the juvenile court adjudicated the children under § 43-247(3)(a), finding that the State met its burden by showing that Jana's refusal to address her mental health placed the children at a risk of harm and deprived them of necessary parental care. The juvenile court additionally terminated Jana's parental rights to Kurstin and Austin, finding that the State proved by clear and convincing evidence that § 43-292(2) and (5) applied, and that terminating Jana's parental rights was in the children's best interests. Jana timely appealed the juvenile court's order.

## ASSIGNMENTS OF ERROR

Jana assigns, summarized, restated, and renumbered, that the juvenile court erred (1) in adjudicating the children under § 43-247(3)(a), (2) in finding sufficient evidence to support termination of her parental rights under § 43-292(2) and (5), and (3) in finding termination was in the best interests of the children.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches conclusions independently of the juvenile court's findings. *In re Interest of Noah B. et al.*, 295 Neb. 764, 891 N.W.2d 109 (2017). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). Clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. Further, clear and convincing evidence is more than a preponderance of evidence, but less than proof beyond a reasonable doubt. *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 644 N.W.2d 574 (2002).

ANALYSIS

*Adjudication Under § 43-247(3)(a).*

Jana argues that there was insufficient evidence for the juvenile court to adjudicate Kurstin and Austin under § 43-247(3)(a). We disagree.

Section 43-247(3)(a) provides that the juvenile court in each county shall have jurisdiction of any juvenile whose parent neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health and well-being of the juvenile. At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Anaya*, 276 Neb. 825, 758 N.W.2d 10 (2008). While the State need not prove that the juvenile has actually suffered physical harm, at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.*

Jana's argument that there was insufficient evidence to adjudicate Kurstin and Austin under § 43-247(3)(a) fails for multiple reasons. First, the State presented sufficient evidence that Kurstin and Austin were previously adjudicated under § 43-247(3)(a). At the joint hearing, multiple witnesses testified that Kurstin and Austin were previously adjudicated in April 2017 due to Jana's unaddressed mental health issues. Jana did not present any evidence rebutting this testimony. Thus, there was sufficient evidence that the children were previously adjudicated under § 43-247(3)(a).

Regardless of whether there had been a previous adjudication, the State presented sufficient evidence to support an adjudication on March 15, 2018, the date of the combined adjudication and termination hearing. The State sought both an adjudication and termination in its pleading filed in December 2017. At the March 2018 hearing, the State proved that the children witnessed Jana take an unknown number of antidepressant pills, heard her threaten to commit suicide multiple times, and Jana became physically violent with Austin, scratching him in the face. The State alleged, and the juvenile court agreed, that Jana's untreated mental health issues placed the children at risk of harm.

Moreover, Jana's argument that the children were not adjudicated under § 43-247(3)(a) prior to the State's petition for termination of her parental rights is meritless under established Nebraska law. The Nebraska Supreme Court has held that it is not necessary to adjudicate a child as a juvenile under the Nebraska Juvenile Code prior to the termination of parental rights under

§ 43-295(5). *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999). The juvenile court acquires jurisdiction of a case for termination of parental rights in an original action under the Nebraska Juvenile Code, which includes a motion for termination of parental rights. *In re Interest of Joshua M. et al., supra*. Thus, Jana's argument that Kurstin and Austin were not previously adjudicated under § 43-247(3)(a) is neither accurate nor relevant because the juvenile court gained jurisdiction over them as a result of the State's motion to terminate Jana's parental rights under subsection (5).

*Statutory Grounds for Termination.*

Jana assigns that the juvenile court erred in finding sufficient statutory grounds to terminate her parental rights. She particularly argues that it was inconsistent to find her mentally ill under § 43-292(5) yet have the requisite intent to knowingly refuse to give necessary parental care and protection under § 43-292(2). As a result, she claims the State failed to prove sufficient statutory grounds for termination. We disagree.

For a court to terminate parental rights, it must find that one or more of the statutory grounds listed in § 43-292 have been satisfied, and that such termination is in the children's best interest. *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007). The State must prove these facts by clear and convincing evidence. *Id*. Here, the juvenile court found sufficient evidence to terminate Jana's parental rights to the children under § 43-292(2) and (5). Section 43-292(2) allows termination of parental rights when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile necessary parental care and protection. Subsection (5) allows termination when the parents are unable to discharge parental responsibilities because of mental illness or mental deficiency and there are reasonable grounds to believe that such condition will continue for a prolonged indeterminate period.

Nebraska appellate courts have found that mental illnesses and deficiencies that prevent a parent from performing daily tasks and routine parental duties are grounds for termination of parental rights under § 43-292(5). See *In re Interest of Marcus W. et al.*, 11 Neb. App. 313, 649 N.W.2d 899 (2002) (holding that mother who had frontal lobe impairment, generalized anxiety disorder, and mood disorder would need assistance for daily living activities, and therefore termination was appropriate under § 43-292(5)). See, also, *In re Interest of C.A.A. and V.S.A.*, 229 Neb. 135, 425 N.W.2d 621 (1988). Additionally, the Supreme Court has held that a mother with a severe mental health disorder, coupled with her failure to consistently take required medication, allowed for termination of her parental rights under § 43-292(5). See *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

Contrary to Jana's arguments, § 43-292(5) does not require that a mental illness or deficiency render a parent totally incompetent. The plain language of § 43-292(5) indicates that the mental illness or mental deficiency must only render a parent unable to discharge his or her parental responsibilities, it does not have to render the parent completely incompetent. See *In re Interest of Holley*, 209 Neb. 437, 308 N.W.2d 341 (1981). The Supreme Court has held that personality disorders which prevent a parent from profiting from instruction and acquiring parenting skills is a sufficient mental deficiency under § 43-292(5). See, *In re Interest of Natasha*

*H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *In re Interest of D.L.S.*, 230 Neb. 435, 432 N.W.2d 31 (1988).

The State presented evidence demonstrating that Jana's mental illness prevented her from performing her parental responsibilities. This evidence was sufficient to proceed under subsection (5) if the evidence also supported a finding that there were reasonable grounds to believe that such condition would continue for a prolonged indeterminate period. Such findings are not inconsistent with a determination that Jana also substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection. We therefore reject Jana's argument that a finding of mental illness or mental deficiency under subsection (5) is inconsistent with a termination based also on subsection (2). However, because only one statutory ground for termination need to be proved in order for parental rights to be terminated, we need not discuss whether there was sufficient evidence to terminate under subsection (2) because the evidence was sufficient to do so under subsection (5), as explained below. See *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

In the present case, the record reveals that Jana has a severe mental illness which renders her unable to effectively parent Kurstin and Austin. Jana was diagnosed with schizoaffective disorder, bipolar type, and has symptoms including delusions, mood swings between mania, where she does not sleep for days at a time, and intense depression, as well as psychosis. Jana's mental illness prevented her from discharging her parental responsibilities, as Jana's husband performed all parenting duties, including waking Kurstin and Austin up in the morning, making sure they got to school, and providing meals for them. Additionally, Jana often would stay up all night, making loud noises which kept the children awake, and often became fixated on past murders, where she was unable to speak of anything else. This behavior not only prevented Jana from carrying out her responsibilities as a parent, but it also prevented her from having a beneficial relationship with the children.

Moreover, the juvenile court was correct in finding that there were reasonable grounds to believe that Jana's mental illness would continue for a prolonged period of time. Jana does not recognize that she has a mental illness, and does not cooperate with any attempts at treatment. Further, Jana does not take any medications prescribed to her. Although Jana argues that the State did not provide enough time for her to demonstrate an inability or refusal to receive treatment, the record does not support this position. Phinney testified that although Jana's disorder is treatable with antipsychotic and antidepressant medicine, Jana has resisted every treatment effort for the last 2 years. On the occasions that Jana would take medication, such as when she was involuntary admitted to the hospital, she would only do so in order to be released, and would not continue with the medication once she was released from the hospital.

We recognize that a 3-month time period from the date of filing the termination petition to the date of the termination hearing itself is a very short time, but the evidence reveals Jana's mental health problems date back to at least 2016. A court is not prohibited from considering prior events when determining whether to terminate parental rights. *In re Interest of Hope L. et al.*, 278 Neb. 869, 775 N.W.2d 384 (2009). Whether the mother recognizes her mental health issues and whether she responds to treatment are both highly relevant to whether it is in the best interests of the children that the mother's parental rights be terminated. *Id.* See, also, *In re Interest of Natasha H.*

& *Sierra H., supra* (holding that termination of mother's parental rights was appropriate where mother continually returned to abusive partner and showed limited ability to address her mental health concerns).

The record is clear that Jana has consistently refused treatment or medications for her mental health since at least 2016. Further, Jana refuses to even acknowledge her mental disorder. At the joint hearing, Jana presented no evidence or testimony indicating it was likely that she would begin treatment for her mental illness, thus, making it likely that her mental illness will continue for a prolonged period of time.

Most troubling regarding Jana's mental health is Phinney's testimony that Jana's delusions are becoming more fixed, and Jana does not improve or recover between delusions. Additionally, Jana may be becoming medication resistant, due to her failure to take her medication consistently. Therefore, even if Jana were to become compliant with her medications, there are reasonable grounds to believe that her mental illness will persist indeterminately, in spite of medication.

Based on our de novo review of the record, we conclude that the State produced clear and convincing evidence to support terminating Jana's parental rights under § 43-292(5). We therefore turn to an analysis of the children's best interests.

*Best Interests.*

Jana argues that the juvenile court erred in finding that it was in Kurstin and Austin's best interests to terminate Jana's parental rights. We disagree.

In addition to proving a statutory ground, the State must also show that termination of parental rights is in the best interests of the children. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected. Therefore, before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and while they are separate, each examines essentially the same underlying facts. *Id.*

Here, the State presented sufficient evidence demonstrating that Jana was unfit to care for Kurstin and Austin, and was unwilling to receive treatment to effectively manage her mental health. Witnesses testified that Jana had Kurstin and other minors out past 2 a.m. and was in a vehicle while alcohol was present, and on another occasion, operated a vehicle with minors in the vehicle while under the influence of drugs, thus, endangering everyone in the vehicle. The record also reveals that on numerous occasions law enforcement officers were called to Jana's residence due to threats that she made against her husband or herself. Multiple times these threats led to Jana being placed in emergency protective custody and involuntarily admitted to the hospital for expressing suicidal thoughts. Kurstin and Austin were often present during these incidents and

often witnessed Jana threaten to harm herself. Jana's proclivity to place the children in harm's way, either through her actions or threats, is detrimental to their best interests.

Moreover, Jana's behavior while at the home was detrimental to the children's well-being. Both Kurstin and Austin were placed on probation for truancy while Jana was at the home. Witnesses testified that Jana's habit of staying up all night, and thus keeping the children awake, played a part in the children's inability to attend school. The State produced testimony indicating that during the periods that Jana was hospitalized and out of the house, both Kurstin and Austin's behavior improved. Further, there were concerns that Kurstin was beginning to adopt some of Jana's behavior and Kurstin would act out more when Jana was around.

Upon our de novo review of the record, it is clear that terminating Jana's parental rights is in Kurstin and Austin's best interests. Jana routinely placed her own children, and other minors, in harm's way. Further, Jana's erratic behavior while at home negatively affected the children, and many of the behavioral issues demonstrated by Kurstin and Austin are attributable to Jana's behavior. Importantly, the children demonstrated improvement when they were placed outside of the home or Jana was not present. Finally, Jana has refused to even acknowledge that she has mental health issues, thus, preventing anyone from helping her. When a parent is unable or unwilling to rehabilitate herself within a reasonable time, the child's best interests require termination of parental rights. *In re Interest of Shane L. et al.*, 21 Neb. App. 591, 842 N.W.2d 140 (2013).

Jana argues that given the children's ages, Kurstin was 17 and Austin was nearly 15 at the time of the hearing, the "loss of a parent might also have unintended negative consequences." Brief for appellant at 13. Given the facts of this case, we disagree. We have an unusual situation in which Jana and Brian remained married and in the same home. Brian has been reluctant to divorce Jana or force her to leave, but the children have been out of the home since December 18, 2017. Kurstin testified:

> I am extremely close to my dad, and I - every time I talk about my dad I always want to cry, but without my dad I wouldn't . . . have anything because he's the only one that's ever been there for me, and he's the only one I can count on.

Austin echoed Kurstin's testimony that he, too, is "really close" to Brian and would choose to live with his dad if he could. Both children testified that Brian is the parent who actually parents them, not Jana. And neither child testified to a beneficial relationship with Jana. Brian recognizes Jana's mental health issues and has sought help for her on multiple occasions, but she has been uncooperative. He acknowledged that he was willing to put the children first.

Having found that it is in the best interests of the children to terminate Jana's parental rights based upon the effect her mental health has on them, we further find, based on the evidence above, that a beneficial relationship does not exist between the children and Jana. We therefore conclude that it is in the best interests of the children to terminate Jana's parental rights.

## CONCLUSION

We conclude that the evidence was sufficient for the juvenile court to adjudicate the children under § 43-247(3)(a). Furthermore, the State presented clear and convincing evidence to

support the termination of Jana's parental rights to Kurstin and Austin under § 43-292(5) and that termination was in the children's best interests. We therefore affirm the order of the juvenile court.

AFFIRMED.